### EX PARTE JOE WRIGHT.

#### No. 1629.   Decided December 20, 1911.

**Contempt—Interfering with Jurymen—Insufficiency of the Evidence.**

Where, in contempt proceedings in the District Court, for interfering with one of the special veniremen, the testimony of the veniremen did not indicate that relator undertook to influence him, or even to talk about the case in which he was summoned in any way; but the conversation between the juror and relator was that the latter said, "You are on the jury next week," to which the juror replied, "Yes, I know I am," when they separated, the same was insufficient to support the judgment for contempt.

From Bexar County.

Original habeas corpus proceeding, asking release on a commitment issued out of the District Court for contempt of court in interfering with a juryman; penalty, a fine of $100 and confinement in the county jail for three days.

The opinion states the case.

*Theo. E. Simmang, James Routledge* and *Ed. Haltom,* for relator.— Ex Parte McRae, 77 S. W. Rep., 211; 9 Cyc., pp. 6, 15, 16, 24, 38, 39, 41, 45, 46.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The relator was fined for contempt by the district judge for interfering with one of the special veniremen who was drawn in the Norton case, a homicide case, pending before the judge. It may be assumed from the facts that relator was a friend of Norton, and it is shown that a special venire had been drawn returnable on Monday, the 20th of the month.. Some days prior to this particular Monday, relator seems to have gotten hold of a list of the veniremen. Upon this list was the name of Felix Esser. Felix Esser testified that he was a contractor, and was summoned on the special venire in the Norton case; that he found it out by coming to the court room; that he did not recollect who summoned him, but he was summoned by reason of a notice left at his brother's saloon at the corner of Eighth Street and Avenue B. His brother's name was Charley. He could not fix the date definitely, but he remembers that the fair was going on. This was with reference to the time he saw the relator. He thought it was about the 17th of November, however. The notice had been at the

saloon about six hours before he got it.  His brother was present and
called his attention to the notice when he returned from his work.
The notice received did not state what case in which he was a jury-
man; it simply notified him to appear in the 37th Judicial District
Court on Monday 20th.  He did not see the relator for sometime after
receiving the notice, but that he did see the relator about three weeks
after he received the notice, or two weeks and a half.  Without going
over this part of the testimony, the witness' memory seems to have been
very indistinct as to the time he did see relator.  But when he did
see him he was in his brother's saloon, to which point he had come
from the place where he had been at work a short distance away.  When
he entered the saloon relator was in there.  They had a drink of beer
together, relator paying for it.  In other words, when they were in
there, relator "set them up."  Witness was then en route to dinner.
He lived just across the street near the saloon.  After drinking the
beer he says he did not have any conversation with relator.  "When
he called me outside, I went with him about twenty-five steps from the
saloon, when I went out I did not have any conversation with him.
He just called me out and said, 'I want to see you; you are on the
jury next week.'  Then he got in his buggy and drove off.  I knew I
was on the jury; he did not tell me what case I was on.  All he said
was that I was on the jury next week, and drove off.  I did not then
have a conversation with my brother with reference to Joe Wright.
Joe Wright did not have anything in his hands during the conversa-
tion, or at any time, but a cigar.  I did not see any list; he did not
show me any list.  When I got to the saloon, Joe Wright was talking
to my brother; my brother was behind the bar.  I did not see him
showing anything to my brother.  I had no conversation with my
brother after Joe Wright left.  I had known Joe Wright all my life.
I was not friendly with him.  Joe Wright never came to my place of
business before, and notified me that I was on a jury.  This was the
first time.  I think Joe Wright was coming there with eggs.  Selling
eggs to my brothers; he raises chickens, and stuff.  He didn't have any
eggs that day.  I mean sanitary nest eggs.  I don't know that he said
anything about eggs that day.  He just called me outside and said,
"You are on the jury next week," and he drove off, and I says, "I
know I am."  When he told me that I knew I was on the jury.  I had
my notice already.  Joe Wright didn't tell me what case I was on.
When I left Joe Wright and went back to the saloon, I didn't say to
my brother, "I am on the Norton case."  This witness was a juryman
that was supposed to have been tampered with by relator.

Charles Esser, the saloon man, a brother of the juryman, stated that
he lived on Eighth Street and Avenue B, and is in the saloon business.
He testified, in substance, that relator came to his saloon, and asked
him about his brothers and their names.  The juryman was named
Felix, and relator asked him which was Felix, and he informed him
that it was the one they called "Red."  It seems that relator knew him

by the name of Red, and not by the name of Felix. He says he could not exactly say what day, but believed it was on Monday, about 12 or 1 o'clock. He drove up in his buggy, and said, "Hello, son." I said, "Hello, Joe." I really know Joe better than he knows me. I used to gamble with him when he was in that business, at different places. Probably he knows some of my brothers, but not me. He came into the saloon and said, "Hello, son," and he says, "Give us a drink," and I waited on him, and he asked me how many of us boys there were, and I said four: there is Will, the oldest, then Felix, the second oldest, then Charles (myself), then Frank, the younger one. He says, "Well, which one is Felix?" I said, "Well, the one they call Felix is the one they call 'Red,' just a nick-name." "Well," Joe says, "Where can I find Red?" I said, "Well, he is at work now, Joe, down the street, I don't know when he will be in, or whether he will come in at all; nothing like that I couldn't tell, because he is out working," and so we were talking there, and Mr. Boyd, the store man next door, and Joe Wright; were just talking about things that happened a long while back, about rooster fights and gambling, and one thing and another away along while back; and in the meantime, Felix steps in just about the time we got through with the conversation. I had been talking with Wright just about half an hour, maybe, before Felix arrived. While Joe Wright and I were standing there talking, Mr. Boyd stepped in for something, I don't know what, and I says to Mr. Boyd, "There is Joe Wright there, are you acquainted with him?" And Mr. Boyd looked at him and shook hands with him; I couldn't say that Mr. Boyd had left the saloon or not, when Felix arrived. I didn't pay that close attention to it. Before Felix stepped in, Mr. Wright called me aside and showed me a paper with writing on it, printing; I did not take the paper in my hands, never had it in my hands, I saw it when he took it back to the back door and read it to me. I was on the inside of the door, and he was on the outside; when he first pulled the paper out, Mr. Boyd was up to the bar. Wright went into the rear first, to the water closet; then he stepped in and says, "Come here, son, I want to see you." There is no back room; it was in the back of the saloon. When he told me to come there, I guess he was about twenty feet away from me, and about the same distance from the crowd that was in the saloon. I have got just a small place there. When he said, 'Come here, son, I want to see you,' he had nothing in his hand; when I got to him he reached in his inside coat pocket and pulled out a paper like that and unfolded it. I don't know what kind of paper it was, regular examination paper it looked like, fully that size (referring to a legal cap size sheet of paper). I don't know how many sheets there were. I didn't count them. I guess three or four, and probably more, but there was anyway three, if not more. It had been written with a typewriter; he did not give it to me in my hands, he held it in his own hands, and I was standing up against the door, and he read some of the names off of it. He did not say nothing to me

as he read the names off, only told me that he was going to read the names off and he wanted me to let him know which ones I knew on there he would read off; I do not know how many names he read off; I haven't the least idea. He didn't give any addresses. I can remember a few of the names that he read. He called one off that's my brother, Felix Esser. I know him. He began at the top of the list and called them off. He called Felix Esser, William Herpel, I don't know whether it was the young one or the old one; I know both of them. I told him I knew him. I didn't tell him where he lived. Afterwards he came back and he asked me where some of them lived, and I told him. I told him Herpel lived up the street; I didn't give him the house number, the street number." This witness mentioned two or three other names about whom relator inquired. With reference to what occurred in the saloon after Felix came, the witness said: "My brother Felix came in after Mr. Wright was there reading the papers. When Mr. Wright finished reading the papers, he put them in his pocket and walked up to the door and ordered another round of drinks. I told my brother, I says, 'Red, Joe Wright wants to see you,' just that way. Well, he offered Felix a drink, too, and he drank with all of us there, and Joe looked at his watch and saw what time it was, and he said, 'Well, I've got to go,' and I said, 'Well, take a drink with me,' and they took a drink and Joe went out and called Felix out and Felix went out and that is the last I saw of them. That is the last I saw of them until Felix returned and Joe drove off. Felix talked to him a very short time on the outside; I don't believe it was over two minutes." This witness did not see or hear them after they went out of the saloon.

It was shown that there was a special venire drawn in the case of the State v. Norton, which was issued on October 13, 1911, and placed in the hands of the sheriff of Bexar County. That it contained about two hundred names; that it was returned by the sheriff to the clerk's office on November 16th, and was served on Norton on November 16th; that the service on Felix Esser shows to have been on the 26th of October; that this list contained the name of Herpel, Menck, Bowman, and Dunbar. These seem to have been the jurors about whom relator was making inquiry of Charles Esser. There is this in the record also, that the court took judicial notice of the fact that at the time Wright approached and talked with Felix Esser and Charles Esser, and exhibited the typewritten names to Charles Esser, there was in force in his court a rule which he had prescribed prohibiting the sheriff and district clerk from disclosing, making public or giving to anyone, except their deputies, the list of names of any special venire prior to the date upon which such special venires were, by order of the court, made returnable. The court also says he had knowledge of the fact that the special venireman, Felix Esser, while being tested as a special juror in the Norton case, swore that Joe Wright, when he took him out of the saloon to speak with him, stated that Wright did not say anything to him about being a juror in the Norton case. Whereupon, on motion

of the State, before passing on this juror, to further investigate this matter, Charles Esser was subpoenaed and sworn and questioned relative to these transactions, and he then swore that Felix Esser told him that Joe Wright had told him he was a juror in the Norton case. At that time, Charles Esser also swore that Wright showed him the list and told him it was the jury in the Norton case. On this hearing he swore he learned this at a later date. The State challenged the juror, Felix Esser, for cause and he was excused by the court. Thereupon the court ordered the clerk to issue notice to Joe Wright to appear and show cause why he should not be fined for contempt of court.

This is practically the case, at least it is a sufficient statement of the case. Upon these facts the court adjudged relator in contempt of court, and assessed a punishment. We are of opinion the evidence does not justify the conclusion of the court. Ex Parte McRea, 77 S. W. Rep., 211. The McRea case seems to be a stronger case on the facts than this. Judge Brooks said, in delivering the opinion, that "mere effort to secure the service of a party to find out how a juror stands in reference to a case then on trial, does not authorize punishment for contempt, where the party so employed neither makes an effort to tamper with the juror, nor holds out any inducement to the juror to decide one way or the other, nor talks with the juror about the case." The testimony of the special venireman does not indicate that relator undertook to influence him or even to talk about the case in any way. The conversation as detailed by the juror is that relator said to him, "You are on the jury next week." The juryman said, "Yes, I know I am," and they separated. Under this testimony, we are of opinion that the judgment for contempt should not have been entered or punishment assessed.

Relator is ordered discharged.

*Discharged.*